## MICROCOMPUTER TECHNOLOGY INSTITUTE, Plaintiff,

v.

## Richard W. RILEY, Secretary, and the United States Department of Education, Defendants.

### Civil Action No. H–96–3435.

United States District Court,
S.D. Texas.

Feb. 11, 1997.

John D. Thompson, III, Bracewell & Patterson, Houston, TX, for Plaintiff.

Gerald L. Meyer, Office of the U.S. Attorney, Houston, TX, for Defendants.

**Opinion on Summary Judgment**

HUGHES, District Judge.

### 1. *Introduction.*

A technical institute offering associate degrees sued the department of education to stop its recovery of funds granted to the institute for educating Texas prisoners. In an audit by the education department, it claims that the institute's contracts with the state made the prisoners ineligible for tuition reimbursement since the inmates were not personally liable for tuition. The institute accurately applied for and correctly received federal funds. The education department will not be reimbursed.

The statute applied to crooks taking electronics in prison just as it did to saints taking humanities at Harvard. The law does not allow the government to order its priorities after the fact at the expense of those citizens who supplied a service.

### 2. *Background.*

In 1980 Microcomputer Technology Institute (Micro Tech) was established in Houston to train in electronics, especially high-level vocational training. In 1987 Micro Tech attained degree-granting status in computer systems and biochemical electronics. Now it is approved for six associate degrees; more than 1,000 students are enrolled. To train at Texas prisons, Micro Tech had to get approval from the Texas Educational Agency. It did.

In the 1980s, Texas began using "private" prisons. In 1988, the state hired the Correction Corporation of America and the Wackenhut Corrections Corporation to operate "pre-release" facilities to house inmates who were soon to be released. Among other service contractors, Micro Tech furnished vocational training to inmates.

The contracts between the corporations and the state required education to be furnished at no cost to the inmate irrespective of the inmate's ability to qualify for financial assistance. Micro Tech offered the inmates the same courses as the school's students in the free population. For both classes of students, Micro Tech waived the difference between regular tuition and grants.

The United States department of education through its financial assistance program approved Micro Tech's plan. The Department could have reviewed Micro Tech's contracts with the corporations; at the certification phase, it did not object to either the eligibility of inmates or the contracts. After approval from the federal program, Micro Tech began vocational training throughout Texas. After teaching from 1989 to 1993, Micro Tech stopped teaching inmates when the statute was amended.

The institute trained roughly 5,000 inmates from 1989 to 1993. It taught 1,500 inmates at its own expense just as it offers scholarships to students in its regular programs. The tuition ranged from $2,300 to $2,400 for each program. Micro Tech was not paid for its services by the state or the corporations. Micro Tech collected slightly over eight million dollars in student assistance from the Department.

### 3. *The Audit.*

Four years after Micro Tech began, the education department's inspector general audited Micro Tech's use of grants. The audit concluded that from July 1, 1988, to June 30, 1993, it had awarded Micro Tech an excess of $8,139,146 for students in Texas prisons. The government accepted the audit and demanded a refund.

The refund is derived from a new and peculiar reading of the statute. The program office, reversing itself, accepted the auditor's reasoning that, because inmates were not directly liable for the full tuition, none of the inmates was authorized to receive a grant.

### 4. *Cost of Attendance.*

Under the statute, a student was awarded 60% of her "cost of attendance." The statute included "the tuition and uniform compulsory fees normally charged a full-time student at the institution. . . ." as well as room, board, books, supplies, transportation, and other expenses. 20 U.S.C. § 1070b(1). Over the history of the program, the percentage of the costs paid by the grant ranged from 50% to 75%. These awards are commonly referred

to as Pell Grants after the senator who proposed the program.

Micro Tech calculated the grant amounts by adding the normal tuition charged to the normal other expenses. The education department claims the inmates incurred only $155 in miscellaneous expenses each. When Micro Tech calculated the inmates' grants, it used its "normal" rate of $2,300 or $2,400. On the average, Micro Tech's calculation of the grants resulted in lower amounts than charged students who are not in prison.

### 5. *Legislative Chronology.*

The evolution of the definition of *attendance* shows the attempts to clarify how to calculate grants.

- In 1965, the original statute authorized grants only to "qualified high school graduates of exceptional financial need" for their "cost of attendance." *See* HIGHER EDUCATION ACT of 1965, Pub.L. No. 89–329, 1965 U.S.C.C.A.N. (79 Stat) 1230, 1245.

- In 1972, the statute was amended to grant funds equal to 50% of a student's "actual cost of attendance." See EDUCATION AMENDMENTS OF 1972, Pub.L. No. 92–318, § 411(a)(2)(B)(i), 1972 U.S.C.C.A.N. (86 Stat.) 278, 294. "Cost of attendance" was defined as "the actual per-student charge for tuition and fees."

- In 1980, the statute was amended to delete "actual" from the definition. The law then said that "the term cost of attendance" means "tuition and fees normally assessed a full-time student at the institution." *See* EDUCATION AMENDMENTS OF 1980, Pub.L. No. 96–374, § 411(a)(1)(B), § 482, 1980 U.S.C.C.A.N. (94 Stat.) 1367, 1401, 1447.

- In 1986, "cost of attendance" was redefined as a "student's tuition and . . . fees at the institution . . ." *See* HIGHER EDUCATION AMENDMENTS OF 1986, Pub.L. No. 99–498, § 411F(5)(A), 1986 U.S.C.C.A.N. (100 Stat.) 1268, 1324.

- In 1987, the phrase "tuition and . . . fees normally charged" replaced "student's tuition and . . . fees." *See* HIGHER EDUCATION TECHNICAL AMENDMENTS ACT OF

1987, Pub.L. No. 100–50, § 411F(5)(A), 1987 U.S.C.C.A.N. (101 Stat.) 335, 338. As the legislative history reveals, the change was to allow institutions to "use the *average* tuition and fees rather than the *precise* tuition and fees of each student" in calculating grants. *See* H.R.REP. No. 100–44, 100th Cong., 1st Sess. 3 (1987), *reprinted in* 1987 U.S.C.C.A.N. 339, 341; *accord id.* at 14–15, 1987 U.S.C.C.A.N. at 352–53.

- In 1992, the whole program was repealed.

## 6. *Mathematics.*

■ The grant was based on 60% of the tuition and expenses. The problem arises when the school waives the 40% of the cost that is not paid by the grant. In that case, the school has received a grant of 100% of the cost actually charged, and the student, in the language of the department's auditors, has received a gift of 40%. If the grant is calculated after the gift, it could only be 60% of the 60%—or 36% of the normal charge. Of course, if the school continued to waive the difference between the recalculated grant and normal charges, the grant would be allowed at only 60% of 36%, with the regression continuing infinitely.

In the real world, the school accepts the payments from the grant program and waives the balance. Micro Tech here simply agreed with the corporate prisons—as they had with the state—to waive recourse to the students for unpaid tuition.

Before this attack on Micro Tech no interpretation by the government suggested that the 40% difference between the grant and the tuition must be paid by the student. The statute, of course, says directly the opposite. The law says that the grant is for 60% of the tuition normally charged; it says *nothing* about individual liability or ultimate recourse.

## 7. *Estoppel & Retroactivity.*

■ Since at least the late 1970s, the department has consistently defined tuition waivers as student financial aid and has consistently defined cost of attendance as charges and waivers of tuition. While its

earlier position may not create traditional estoppel, it is admissions against interest.

Micro Tech reasonably anticipated that, even if the statute required it to calculate the grants on actual tuition, the base amount would have included tuition waivers. Micro Tech has reasonably relied on the statute and the bureaucracy's application of it in furnishing education to inmates who met the departments requirements for eligibility. The essence of law is that it is knowable, neutral, and prospective. Second thoughts about the cost or other advisability of a program must be applied to the next grants—not to the last or first.

■ The department insists that its view of the underlying contracts must be accepted because of the expertise it brings to the dispute. The United States Department of Education may have some sort of expertise in "education"—whatever that could mean—but it has no expertise in the law of contracts, of gifts, or of prisons. Expertise may be involved in the decision to grant funds to students rather than schools, to support academic rather than vocational education, to use grants rather than loans; those questions of policy about programs and resources have been made by the statute, leaving the executive machinery only clerical functions. Courts defer to expertise of an administrator when there are multiple *reasonable* interpretations of a provision integral to his public function.

The department has retroactively applied an interpretation to this institute that is radically different from that applied to other types of institutions and that it had applied for years. Agency expertise cannot contradict the statute; there is no ambiguity in the act. Of course, nowhere does it explain expertly how the department's experts paid the institute $8 million over four years without noticing expertly that it should not.

## 8. *Conclusion.*

The education department mis-characterizes Micro Tech's calculation of grants, its own past policy, and the statute. Whether this process represents a new policy hostile to inmates or pure bureaucratic manipulation is

not clear. What is clear is that the institute complied with the law and properly received the funds.

This case represents an object lesson in the Constitution's multiple restraints on arbitrary government, like the takings, due process, and equal tax clauses, and the hearing officer's acceptance of the departments position shows the importance of an independent judiciary. *See generally* U.S. CONST.

Micro Tech is entitled to keep the funds made available to students by grants because they met statutory requirements. The education department's retroactive application of the grant policy has no basis in law.